IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| VINCENT WHITE, | ) | |
|     Plaintiff, | ) | |
| | ) | |
| vs. | ) | CIVIL ACTION NO. 14-502-KD-M |
| | ) | |
| JOHN MCLAIN, JOHNNY THORNTON, | ) | |
| SR., JOHN CASSIDY, GREG O'SHEA, | ) | |
| ALLEN O'SHEA, JEFFERY SULLIVAN, | ) | |
| and CLINTON LAW | ) | |
|     Defendants. | ) | |

**ORDER**

This matter is before the Court on Defendants' Motion for Summary Judgment and Supporting Materials (Docs. 29-30, 32-33), Plaintiff's Response (Docs. 34-35), and Defendants' Reply (Docs. 37-38). Upon consideration the motion is **GRANTED** in part and **DENIED** in part.

Plaintiff Vincent White ("White") has brought claims against the following Defendants who were all Mobile County Sheriff's Office Deputy Sheriffs at the time of the events giving rise to this complaint: John McLain ("McLain"), Johnny Thornton, Sr. ("Thornton"), John Cassidy ("Cassidy"), Allen O'Shea, Greg O'Shea, Jeffrey Sullivan ("Sullivan"), and Clinton Law ("Law"). All Defendants are being sued in their individual capacities. (Doc. 1 at 2).

**I.     Facts**[1]

In October 2012, Mobile County Sheriff's Deputy John McLain ("McLain") received information from a confidential informant that an individual was involved in the distribution of marijuana and that the individual was storing drugs at his girlfriend's residence located at 1817

---

[1] On summary judgment, the Court must "resolve all issues of material fact in favor of the [non-movant], and then determine the legal question of whether the [movant] is entitled to judgment as a matter of law under that version of the facts." *McDowell v. Brown*, 392 F.3d 1283, 1288 (11th Cir. 2004).

Toulmin Avenue, Mobile, Alabama. (Doc. 30-2 at 8; Dep. McLain at 39). McLain and the confidential informant drove past the residence and the informant pointed out the house to McLain. (Id.) Three months later, McLain received corroboration from a different confidential informant. (Id.; Doc. 35-3 at 1). Both informants told McLain that the house in question was the second house on the left after turning from St. Stephens Road. (Doc. 30-2 at 9; Dep. McLain at 40). A month later, the second informant again told McLain about the drug activity at 1817 Toulmin Avenue. (Doc. 30-2 at 10; Dep. McLain at 41 and Doc. 35-3).

On February 5, 2013, McLain traveled to Toulmin Avenue. (Doc. 30-2 at 10-11; Dep. McLain at 41-42). However, rather than entering from St. Stephens Road, he turned onto Toulmin Avenue from Carleton Street, which resulted in him approaching the house from the opposite direction than he would have if he had entered from St. Stephens Road. (Id). When approaching from St. Stephens Road, the first house on the left it situated further back from the street than the other houses on Toulmin Avenue. (Doc. 35-3 at 2). McLain approached what he "believed to be the second house" and took a photograph of it. (Doc. 30-2 at 11; Dep. McLain at 42). The house he took a photograph of was 1819 Toulmin Avenue (plaintiff Vince White's house), rather than the target house 1817 Toulmin Avenue. Id. White's house, 1819 Toulmin Avenue, is the third house on the left when approaching from St. Stephens Road and the target house, 1817 Toulmin Avenue, is the second house on the left. (Doc. 35-12 at 6; Dep. McLain at 44).

Before taking the photograph, as McLain approached 1817 Toulmin Avenue, he noticed people who he thought appeared to be engaged in drug activity, standing in front of what McLain thought was 1817 Toulmin Avenue. (Doc. 30-2 at 11-12; Dep. McLain at 42-43). "So not to expose [himself] as a narcotics officer," McLain "pulled off the side of the road" and took a

photograph of White's home, which he "believed to be" 1817 Toulmin Avenue. (Id.). Though not visible in the photograph McLain took, White's numerical street address (1819) is posted at eye level to the left of his front door. (Docs. 35-1 at 2 and 35-16 at 2-3; Dep. Sullivan at 32-33).

In the darkness of the early morning hours of February 6, 2013, McLain travelled to Toulmin Avenue to check out information from an informant. An informant had told McLain that a "certain vehicle dropped off some drugs" and "[McLain] was trying to determined if that vehicle was at the location." (Doc. 30-2 at 13-14; Dep. McLain at 47-48). Neither 1817 nor 1819 Toulmin Avenue had any residential lights turned on when McLain passed. (Doc. 35-3 at 2). Looking straight at 1817 Toulmin Avenue, its driveway is on the right side of the house. (Doc. 30-2 at 14; Dep. McLain at 48). From the same vantage point, 1819 Toulmin Avenue is to the right of 1817 Toulmin Avenue. McLain observed the vehicle he had been looking for, and it was parked "back behind the house." [2]

As a result of the information McLain obtained from the informants and the details uncovered during investigation, he obtained a search warrant for 1817 Toulmin Avenue. (Doc. 35-3 at 2). However, in the search warrant application, he attached a picture of 1819 Toulmin Avenue rather than 1817 Toulmin Avenue. (Doc. 30-12 at 2). Additionally, McLain's written description of the place to be search described the facade of 1819 rather than 1817 Toulmin Avenue. (Id.)

Later that morning, McLain briefed members of the Mobile County Sheriff's Office Narcotics and Vice Unit about the upcoming search of 1817 Toulmin Avenue. (Doc. 35-12 at 8; Dep. McLain at 49). Defendant Deputies Johnny Thornton, Sr., John Cassidy, Allen O'Shea,

---

[2] McLain stated, "I had to get out of my car on the next street and walk through, and just look through the wooded area. I could barely see the house, but I could see the car." (Doc. 30-2 at 14; Dep. McLain at 48). When asked, "So from Toulmin, you could not even see the car? I mean it wasn't in the driveway, but back towards the back of the house? It was all the way around behind the house?," he answered, "Yes." (Id.).

Greg O'Shea, Jeffrey Sullivan, and Clinton Law were present at the briefing. (Docs. 35-13 through 35-18). During this meeting, McLain showed the deputies a photograph of White's house, which was 1819 Toulmin Avenue and told them that this was the house where the search warrant was to be executed. (Doc. 32 at 5; Doc. 35 at 8).

After the briefing, the Defendants travelled in several vehicles to Toulmin Avenue. When the deputies arrived at 1819 Toulmin Avenue, several of them attached a truck's winch hook to the burglar bars on the front door. (Doc. 35-16 at 3; Dep. Sullivan at 35-36). Other deputies arranged themselves outside the home. McLain gave the "go" signal and deputies pulled the burglar bars from the front door. Deputy John Cassidy forced entry into the home using a ram. (Doc. 35-15 at 6; Dep. Cassidy at 48). Defendant Deputy Clinton Law entered the home first, holding a riot shield. (Doc. 30-8 at 10; Dep. Law at 43). McLain, Greg O'Shea, Johnny Thornton, and Captain Razzie Smith followed Law into the home. (Doc. 33 at 5; Doc. 34 at 3).

Prior to the Defendants' entry, White was home preparing to attend a doctor's appointment. As the Defendants entered his home, White was moving from his bedroom into the hallway. (Doc. 33 at 5; Doc. 34 at 4). Law detained White, kicking his legs apart and placing him in handcuffs. (Doc. 33 at 6; Doc. 34 at 4). Law also forced White to get down on the floor of the bathroom. (Doc. 35-19 at 7; Dep. White at 39-40). Law used his hands to push White onto the floor while yelling for White to get down. (Doc. 35-19 at 7-8; Dep. White at 39-44).

Within minutes the Defendants realized their error. Captain Razzie Smith brought White up from the floor and removed the handcuffs from his wrists. (Doc. 35-19 at 9; Dep. White at 46-48). Smith apologized to White and explained that there had been a mix-up and that White's home had been entered in error. (Id.).

In January 2013, the month before the search, White underwent abdominal surgery. (Doc. 35-19 at 10-12; Dep. White at 60-68). On February 6, 2013, White had a pre-scheduled appointment with his doctor several hours after the search. (Id.). His doctor checked his incision, which was not leaking at that time. (Id.). Several hours later, White went to the emergency room at Mobile Infirmary, complaining of abdominal pain and experiencing leakage from his surgical incision. (Id.). He was admitted and treated at the hospital. (Id.). He seeks damages including but not limited to medical expenses, and compensation for the physical and emotional injuries he suffered as result of the events of February 6, 2013. (Doc. 1 at 13; Doc. 35-2; Aff. White).

## II. Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a) (Dec. 2010). Amended Rule 56(c) governs Procedures, and provides as follows:

> *(1) Supporting Factual Positions.* A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
>> **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>>
>> **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
>
> *(2) Objection That a Fact Is Not Supported by Admissible Evidence.* A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.
>
> *(3) Materials Not Cited.* The court need consider only the cited materials, but it may consider other materials in the record.
>
> *(4) Affidavits or Declarations.* An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be

> admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

FED.R.CIV.P. Rule 56(c).  Defendants, as the parties seeking summary judgment, bear the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  If the nonmoving party fails to make "a sufficient showing on an essential element of her case with respect to which she has the burden of proof," the moving party is entitled to summary judgment.  *Celotex*, 477 U.S. at 323.  "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter.  Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998-999 (11th Cir. 1992) (internal citations and quotations omitted).

**III.    Analysis**

    **A.    White's 42 U.S.C. § 1983 Claims (Counts I, II, and III)**

White brings three claims under 42 U.S.C. § 1983, which provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

42 U.S.C. § 1983. In order "[t]o sustain a cause of action based on section 1983, [a plaintiff] must establish two elements: (1) that [he] suffered a deprivation of rights, privileges or immunities secured by the Constitution and laws of the United States, and (2) that the act or omission causing the deprivation was committed by a person acting under color of law." *Wideman v. Shallowford Community Hosp., Inc.,* 826 F.2d 1030, 1032 (11th Cir.1987) (internal quotations and citation omitted). Here, there is no question that the Defendants were acting under color of state law at the time of their actions: Defendants were employed by the Mobile County Sheriff's Department and were engaged in carrying out the execution of a search warrant.

White's claims arise from the alleged violations of his Fourth Amendment rights to be free from unreasonable searches and seizures and from the use of excessive force. All claims arise out of the unlawful entry of his home without proper justification. Count I is a §1983 claim for unlawful entry/unlawful search and seizure, Count II is a § 1983 claim for false arrest/false imprisonment, and Count III is a § 1983 claim for excessive force.

    1.    **Count III – Excessive Force**

In *Bashir v. Rockdale Cnty., Ga*, the Eleventh Circuit held:

> "Under this Circuit's law ... a claim that any force in an illegal stop or arrest is excessive is subsumed in the illegal stop or arrest claim and is not a discrete excessive force claim." *Jackson v. Sauls,* 206 F.3d 1156, 1171 (11th Cir.2000) (citing *Williamson v. Mills,* 65 F.3d 155, 158–59 (11th Cir.1995)). The right to make an arrest "necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor,* 490 U.S. 386, 396, 109 S.Ct. 1865, 1871–72, 104 L.Ed.2d 443 (1989). It follows, then, if an arresting officer does not have the right to make an arrest, he does not have the right to use any degree of force in making that arrest. This is the premise of Bashir's "excessive force" claim; but this is not what is meant by "excessive force." An excessive force claim evokes the Fourth Amendment's protection against the use of an unreasonable quantum of force (i.e., non-de minimis force unreasonably disproportionate to the need) in effecting an otherwise lawful arrest. When properly stated, an excessive force claim presents a discrete constitutional violation relating to the manner in which an arrest was carried out, and is independent of whether law enforcement had the power to arrest. A claim like

> Bashir's—that the deputies used excessive force in the arrest because they lacked the right to make the arrest—is not a discrete constitutional violation; it is dependent upon and inseparable from his unlawful arrest claim. *Jackson,* 206 F.3d at 1171. We reiterate, where an excessive force claim is predicated solely on allegations the arresting officer lacked the power to make an arrest, the excessive force claim is entirely derivative of, and is subsumed within, the unlawful arrest claim. *Id.; Williamson,* 65 F.3d at 158–59. Bashir does not present a discrete excessive force claim and, therefore, his excessive force claim fails as a matter of law.
>
> This is not to say that Bashir cannot recover for the force used in his arrest. To the contrary, the damages recoverable on an unlawful arrest claim "include damages suffered because of the use of force in effecting the arrest." *Williamson,* 65 F.3d at 158–59; *Motes v. Myers,* 810 F.2d 1055, 1059 (11th Cir.1987) (stating that "[i]t is obvious that if the jury finds the arrest unconstitutional, the use of force and the search were unconstitutional and they become elements of damages for the § 1983 violation"). But, to permit a jury to award damages on Bashir's excessive force and unlawful arrest claims individually "would allow [him] to receive double the award for essentially the same claims." *Cortez v. McCauley,* 438 F.3d 980, 996 (10th Cir.2006).

445 F.3d 1323, 1331-32 (11th Cir. 2006). *See also Barnette v. City of Phenix City*, No. 3:05-CV-00473-WKW, 2007 WL 3307213, at *12 (M.D. Ala. Nov. 6, 2007) *aff'd sub nom. Barnette v. City of Phenix City, AL,* 280 F. App'x 935 (11th Cir. 2008) ("A claim of excessive force that was used during an unlawful search or seizure is generally subsumed into the unlawful search and seizure claim as a measure of damages; it does not constitute an independent cause of action…. At this stage of the litigation, it has been determined that the entry and search of the [plaintiffs'] residence, which necessarily includes the detention of its occupants, was unlawful; therefore, the court need not consider the use of excessive force as a separate claim.").

Here, Count I alleges that White's Fourth Amendment rights were violated as a result of the Defendants' "unlawful entry, search and seizure." (Doc. 1 at 9). Because the excessive force claim is subsumed into Count I, the Court finds that White's stand alone excessive force claim fails as a matter of law. Accordingly, the Defendants' motion for summary judgment as to Count III (excessive force) is **GRANTED**.

### 2. Counts I – Unlawful entry, search, and seizure

On February 6, 2013, the Defendants[3] entered Plaintiff's home at 1819 Toulmin Avenue without a search warrant for that home and without an exception to the warrant requirement. There is no dispute that McLain planned and organized the search. He was responsible for briefing the other defendants who assisted with the raid.

Defendants have invoked the defense of qualified immunity for the claims asserted against them in their individual capacities. "Qualified immunity insulates government actors, in their individual capacities, from civil lawsuits as long as the challenged discretionary conduct does not violate clearly established federal statutory or constitutional rights." *Adams v. Poag,* 61 F.3d 1537, 1542 (11th Cir.1995); *see also Belcher v. City of Foley, Ala.,* 30 F.3d 1390, 1395 (11th Cir.1994). The parties agree that Defendants were within their discretionary authority at all times when the acts in question occurred. Therefore, Defendants are entitled to qualified immunity unless White can show that their conduct violated a clearly established statutory or constitutional right of which a reasonable person would have known. *See Belcher,* 30 F.3d at 1395; *Evans v. Hightower,* 117 F.3d 1318, 1320 (11th Cir. 1997). "General propositions and abstractions do not qualify for bright line, clearly established law. For qualified immunity to be surrendered, pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances." *Wilson v. Blankenship,* 163 F.3d 1284, 1288 (11th Cir. 1998) (internal citations omitted).

In *Hartsfield v. Lemacks*, the Eleventh Circuit reiterated "it [is] clearly established law that, absent probable cause and exigent circumstances, a warrantless search of a residence

---

[3] There may be some dispute regarding whether certain deputies entered or remained outside the front door but without question, Defendants McLain and Law did enter the home.

violates the Fourth Amendment, unless the officers engage in reasonable efforts to avoid error." *Hartsfield v. Lemacks*, 50 F.3d 950, 955 (11th Cir. 1995), *as amended* (June 14, 1995). In *Hartsfield*, the defendant law enforcement officers improperly executed a search warrant at the wrong address. The facts present in *Hartsfield* are as follows:

> During the late afternoon of February 21, 1991, Deputy Sheriff Mike Newton went with a confidential informant ("CI") to a residence located at 5108 Middlebrooks Drive, Forest Park, Georgia; the CI entered and purchased marijuana from a black female known as Nora Grooms, while Newton waited outside in his vehicle. Based upon the foregoing, later that day, Newton obtained a search warrant for the residence at 5108 Middlebrooks Drive.
>
> The next day, February 22, 1991, at approximately 2:30 p.m., Newton erroneously led other law enforcement agents to 51*28* Middlebrooks Drive to execute the search warrant, despite the fact that the warrant in his possession designated the residence to be searched as 51*08* Middlebrooks Drive. None of the other officers had seen the search warrant prior to entry.
>
> After Newton forcibly opened the side door using a battering ram, Defendant Officer Samuel Smith and his partner J.F. Watkins entered the residence with weapons drawn and identified themselves as officers executing a search warrant. Watkins discovered Plaintiff-Appellant Mattie Hartsfield undressing in her bedroom, pointed his weapon at her face, and escorted her to the den. After they determined that no one else was present in the house, Smith and Watkins holstered their weapons; approximately six other officers, and at least one media representative, then entered the residence.
>
> Upon questioning, Mattie Hartsfield insisted that no one had purchased marijuana out of her house. Newton ordered that a Clayton County drug dog be brought into the house; the dog "alerted" on several baseball caps contained in a cabinet in the den. Mrs. Hartsfield explained that one of her sons had been involved with "dope," but an inspection of the cabinet revealed no contraband. Although the cabinet was the only property searched in the house, the officers did walk through the house and visually inspect the premises. When Defendant Officer David Noe finally asked Mattie Hartsfield if she was Nora Grooms and whether there were any drugs in the house, she responded in the negative and stated that Grooms lived up the street. Noe then obtained the search warrant from Newton and saw that the officers had entered 5128 Middlebrooks Drive instead of 5108 Middlebrooks Drive, as specified on the warrant. The search, which lasted for at least 10-15 minutes, then concluded. As Newton departed, he saw the house on the corner, 5108 Middlebrooks Drive, and realized that he had led the officers to the wrong address.

*Id.* at 951-52 (emphasis in original, footnotes omitted).

The district court denied the lead deputy's assertion of qualified immunity, and the Eleventh Circuit affirmed holding, "Although we recognize 'the need to allow some latitude for honest mistakes that are made by officers in the dangerous and difficult process of making arrests and executing search warrants,'…[the lead deputy's] actions in this case were simply not 'consistent with a reasonable effort to ascertain and identify the place intended to be searched' as dictated by *Garrison*." *Hartsfield* at 955 (citing *Maryland v. Garrison*, at 480 U.S. 79 at 88-89 (1987)).  The Eleventh Circuit explained,

> Newton had been to the proper residence the day before the search and had procured the search warrant based upon his own observations supervising a drug buy at 5108 Middlebrooks. Although Newton had the warrant in his possession, he did not check to make sure that he was leading the other officers to the correct address, let alone perform any precautionary measures such as those performed by the officers in *Garrison*.[4] As it is uncontroverted that the numbers on the houses are clearly marked, and that the raid took place during daylight hours, simply checking the warrant would have avoided the mistaken entry. Moreover, evidence before the court showed that the houses were located on different parts of the street, separated by at least one other residence, and that their appearances were distinguishable.
>
> Because Newton did nothing to make sure that he was leading the other officers to the correct residence, we conclude that the district court erred in holding that he was protected by qualified immunity.

*Hartsfield* at 955.

      a.  **Deputy John McLain**

The Court has determined that the same outcome is appropriate under the instant facts. Specifically, the Court concludes that McLain's "actions in this case were simply not 'consistent

---

[4] In concluding that the wrongful search of an apartment believed to be the only apartment on the floor of a building did not violate the Fourth Amendment, the U.S. Supreme Court noted, "The trial court found, and the two appellate courts did not dispute, that after making a reasonable investigation, including a verification of information obtained from a reliable informant, an exterior examination of the three-story building at 2036 Park Avenue, and an inquiry of the utility company, the officer who obtained the warrant reasonably concluded that there was only one apartment on the third floor and that it was occupied by [the suspect]." *Maryland v. Garrison*, 480 U.S. 79, 81 (1987). (footnote not in original).

with a reasonable effort to ascertain and identify the place intended to be searched…'"*Hartsfield* at 955 (internal citations omitted). Though it was undoubtedly an honest mistake, McLain's mistake in taking a photograph of the incorrect home, attaching it to the search warrant affidavit, and showing it to the other defendants in this case with instructions to carry out a search there, was unreasonable. It appears from the photographs of White's home that his numerical street address is visible from the street, even if it was not visible in the photograph McLain attached to the warrant. (Docs. 35-1 at 2 and 35-6). More careful study of the home, from various angles, would likely have resulted in the correct house being photographed. Moreover, the correct house had previously been pointed out to McLain by an informant.

Further, as McLain testified during his deposition, the car he observed around 4:30 a.m. the morning of the search was parked "back behind" 1817 Toulmin Avenue, not "back behind" 1819 Toulmin Avenue. (Doc. 30-2 at 13; Dep. McLain at 47). This is perplexing because McLain observed this vehicle's location after he had taken the photograph of White's house believing it to be the target house. Despite seeing the vehicle parked behind 1817 rather than 1819, he did not realize his error or make any efforts to ensure he had assigned the correct location to the target house.

The Court concludes, for purposes of qualified immunity, that McLain's efforts were insufficient and inconsistent "with a reasonable effort to ascertain and identify" the correct home to be searched. *Hartsfield* at 955 (internal citations omitted). Accordingly, McLain is not entitled to qualified immunity and the Defendants' motion for summary judgment as to Count I against Defendant McLain is **DENIED**.

### b.     Remaining Deputy Defendants

In *Hartsfield*, despite denying qualified immunity as to the lead deputy, the Eleventh Circuit affirmed the district court's grant of qualified immunity to the officers following the lead deputy's instructions, concluding that "nothing in the record indicates these officers acted unreasonably in following [the lead deputy's] lead, or that they knew or should have known that their conduct might result in a violation of the [plaintiff's] Fourth Amendment rights." *Hartsfield* at 956.

At the pre-search briefing, the remaining Defendants were told the correct numerical street address to be searched (1817 Toulmin Avenue rather than 1819 Toulmin Avenue) and shown on a white board a diagram of the area of Toulmin Avenue in which the search was to take place. (Docs. 35-12 at 8; Dep. McLain at 51 and 35-9). However, at this same briefing, these defendants were shown a photograph of 1819 Toulmin Avenue rather than 1817 Toulmin Avenue and instructed that it was the house at which they were to execute what they believed to be a valid search warrant. All of the instructions they received pertained to White's home and came from McLain. These defendants had not engaged in the planning or investigation stages leading up to what they learned at the briefing shortly before the search. Again relying upon the similarities to *Hartsfield*, the Court concludes that the record does not "indicate[] these [defendants] acted unreasonably in following [the lead deputy's] lead, or that they knew or should have known that their conduct might result in a violation of the [plaintiff's] Fourth Amendment rights." *Hartsfield* at 956. Accordingly, Defendants Thornton, Cassidy, Allen O'Shea, Greg O'Shea, Sullivan, and Law are entitled to qualified immunity. Thus, Defendants' motion for summary judgment on Count I as to these Defendants is **GRANTED**.

### 3. Count II – False Arrest/False Imprisonment

Plaintiff's response brief states, "The claims under Count II for False Arrest/False Imprisonment are subsumed in Plaintiff's other claims and Count II is therefore due to be dismissed." (Doc. 35 at 31). The Court agrees. Accordingly, Count II is **DISMISSED**.

With respect to the false/arrest false imprisonment claim as it falls under Count I, the Court finds that Deputy Clinton Law is entitled to qualified immunity for the actions he took with respect to detaining White. Though other defendants assisted in the search, it appears Law was the only defendant who engaged in White's seizure. There is no dispute that Law had neither probable cause nor reasonable suspicion to arrest or detain White. "Absent probable cause, an officer is still entitled to qualified immunity if arguable probable cause existed." *Case v. Eslinger,* 555 F.3d 1317, 1326–27 (11th Cir. 2009) "Arguable probable cause exists where 'reasonable officers in the same circumstances and possessing the same knowledge as the Defendants could have believed that probable cause existed to arrest Plaintiff.'" *Grider v. City of Auburn, Ala.,* 618 F.3d 1240, 1256–57 (11th Cir. 2010). "Indeed, it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that actual probable cause is present, and in such cases those officials should not be held personally liable." *Von Stein v. Brescher,* 904 F.2d 572, 579 (11th Cir.1990) (internal citations, quotation marks, and ellipses omitted). Accordingly, "[e]ven law enforcement officials who reasonably but mistakenly conclude that probable cause existed are entitled to immunity." *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (citation and internal quotation marks omitted).

As outlined previously, the assisting deputies were all working under the impression that they were executing a valid search warrant. When Law grabbed, cuffed, and detained White, he

reasonably believed he was authorized to do so. Accordingly, Defendants' motion for summary judgment as to the false arrest/false imprisonment component of Count I is **GRANTED**.

### B.  White's State Law Claims – Assault and Outrage

Plaintiff has invoked the Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a). In Counts Four and Five of the Complaint, White has alleged the Alabama state law torts of assault and outrage.

Defendants failed to address either state law claim in any of their briefing. "The moving party bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991). By failing to address White's state law claims of assault and outrage, Defendants have failed to meet this initial burden. See also *Mosley v. Alabama Unified Judicial Sys., Admin. Office of Courts*, 562 F. App'x 862, 864-66 (11th Cir. 2014)(The Eleventh Circuit held that when defendant failed to address substance of plaintiff's claim, district court erred by granting defendant's motion for summary judgment on claims to which plaintiff did not respond.). Accordingly, Defendants' motion for summary judgment on White's state law claims for assault and outrage is **DENIED.**

### IV.  Conclusion

Defendants' motion for summary judgment (Doc. 29) as to Count I (unlawful entry, search, and seizure) is **DENIED** as to Defendant McLain and **GRANTED** as to all other Defendants. Count II (false arrest/false imprisonment) is **DISMISSED**. Defendants' motion for

summary judgment as to Count III (excessive force) is **GRANTED**. Defendants' motion for summary judgment as to Counts IV and V (state law claims of assault and outrage) is **DENIED**.

**DONE** and **ORDERED** this **16th** day of **November 2015**.

/s/ Kristi K. DuBose
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**